In the Interest of L.J.H., a child under seventeen years of age.

P.W. and J.W., Intervenors–Appellants,

v.

Greene County Juvenile Office, State of Missouri, Petitioner–Respondent.

No. 24179.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 19, 2002.

752

Don Willoh, Springfield, for appellants.

Bill Prince, Springfield, for respondent.

NANCY STEFFEN RAHMEYER, Judge.

P.W. and J.W. ("Grandparents") appeal the denial of their motion to intervene in a juvenile proceeding concerning their four-year-old granddaughter, L.J.H.[1] The juvenile court took protective custody of the child pursuant to the provisions of Chapter 211[2] because of allegations of abuse and

---

1. L.J.H.'s birthday is June 28, 1996.

2. All references to statutes are to RSMo 2000, unless otherwise indicated.

neglect. Grandparents filed a motion to intervene in the juvenile case pursuant to § 211.177. The juvenile court denied that motion and this appeal follows. We affirm.

■ Initially we must determine whether this court has jurisdiction to decide the matter even though the parties have not raised the issue. *In the Matter of D.K. and C.K.*, 886 S.W.2d 188, 189 (Mo.App. S.D.1994). Grandparents have the right to intervene under § 211.177 in a custody proceeding in juvenile court unless it is against the child's best interest. *Long v. Seely*, 975 S.W.2d 208, 210 (Mo.App. E.D.1998). Rule 120.01(a)[3] provides that appeals in juvenile court matters shall be allowed as provided by statute. The right to appeal in juvenile matters is usually conferred by § 211.261. That statute would not normally apply to grandparents whose motion to intervene brought under § 211.177 is denied. Section 211.261.1 states in part:

> An appeal shall be allowed to the child from any final judgment, order or decree made under the provisions of this chapter and may be taken on the part of the child by its parent, guardian, legal custodian, spouse, relative or next friend. An appeal shall be allowed to a parent from any final judgment, order or decree made under the provisions of this chapter which adversely affects him. An appeal shall be allowed to the juvenile officer from any final judgment, order or decree made under this chapter, except that no such appeal shall be allowed concerning a final determination pursuant to subdivision (3) of subsection 1 of section 211.031.

Nowhere in § 211.261 is a grandparent allowed to directly appeal from a denial of his or her motion to intervene brought under § 211.177. Instead of using § 211.261, grandparents wishing to appeal from a denial of their motion to intervene must do so under § 512.020, a statute that grants any party aggrieved by any judgment of the trial court the right to appeal the case.[4] Section 512.020 states in relevant part:

> Any party to a suit aggrieved by any judgment of any trial court in any civil cause from which an appeal is not prohibited by the constitution, nor clearly limited in special statutory proceedings, may take his appeal to a court having appellate jurisdiction from any order granting a new trial, .... or from any final judgment in the case or from any special order after final judgment in the cause....

As the ruling denying their motion to intervene aggrieves Grandparents, they have standing to appeal under § 512.020. *Long,* 975 S.W.2d at 210. That determination does not end the inquiry.

It must also be determined whether the judgment of the juvenile court is final for purposes of appeal. Rule 74.01 defines when a judgment exists that can be appealed under § 512.020. Rule 74.01(a) dictates that a judgment is a writing denominated "judgment" or "decree," signed by the judge, and filed. A judge's order as to one of multiple claims or parties may also be appealed if the trial court makes an express determination that there is no just reason for delay. Rule 74.01(b); *South-*

---

**3.** The Juvenile Court Rules are Rules 110.01 through 129.13. All rule references are to Supreme Court Rules (2001), unless otherwise stated.

**4.** This also complies with the tenor of Juvenile Court Rule 110.04, which provides that if no procedure in the Juvenile Court Rules specifically applies, then the court shall follow customary practice and procedure in equity and Rules 41 through 101 to the extent those rules are not inconsistent with the Juvenile Court Rules.

*western Bell Media, Inc. v. Cummings,* 803 S.W.2d 128, 129 (Mo.App. E.D.1990).

■ The only order in the legal file disposing of the motion to intervene is a docket entry made on February 21, 2001. After stating the appearances of the parties, it states: "Maternal Grandparents' Motion to Intervene-denied." The juvenile court judge signed his initials to that docket entry. Nowhere in the record on appeal is a writing with the word "judgment" or "decree" used in conjunction with the court's ruling on the motion to intervene. The docket sheet contains no reference to any judgment or decree denying the motion to intervene, nor did the juvenile court make a finding that there was no just reason for delay.

■ The judge's initials handwritten at the end of the docket entry meet the "signed by the judge" requirement of Rule 74.01(a). *In the Interest of J.W.P.,* 986 S.W.2d 198, 199 n. 3 (Mo.App. S.D.1999). The question remains whether the ruling must have been denominated "judgment" or "decree" for it to be appealable. We find that it does not.

This same issue was addressed by the Western District Court of Appeals in *In the Interest of C.A.D.,* 995 S.W.2d 21 (Mo. App. W.D.1999). *C.A.D.* was a direct appeal filed by C.A.D.'s mother after the family court ordered that C.A.D. be kept in the custody of the Department of Mental Health rather than in his mother's custody. The document from which C.A.D.'s mother appealed was signed by the judge, but was not denominated an "order" or "judgment" anywhere in its heading or body. *C.A.D.,* 995 S.W.2d at 26. The court noted:

> Generally, "[a] final and appealable judgment disposes of all issues in the case and leaves nothing for future determination, unless a trial court has specifi-

cally designated the order as a final judgment for purposes of appeal." *Bay's Texaco Serv. & Supply Co., Inc. v. Mayfield,* 792 S.W.2d 50, 51 (Mo.App. E.D.1990). However, "[t]he standard for a 'final' judgment in a juvenile matter differs from that under general civil law. The very nature of a juvenile proceeding entails an on-going case which does not result in a 'final' order, as that term is generally defined. The juvenile court's exercise of continuing jurisdiction over a child, however, does not defeat a right to appeal." *In the Interest of N.D.,* 857 S.W.2d 835, 842 (Mo.App. W.D.1993).

*Id.* at 26–27. The court found that once a disposition of the juvenile is made by the juvenile court, there is nothing left for further determination and the judgment is final and appealable. *Id.* at 27. The court then examined the requirements of Rule 74.01 as it applies to dispositional orders of juvenile courts. The court noted the importance of making custody determinations as expeditiously as possible because those determinations involve young children and any delay would be detrimental to the best interests of the children involved and would not "conduce to the welfare of the juvenile and the best interests of the state" as required by Rule 110.02. *Id.* On that basis, the court held "that the denomination requirement of Rule 74.01(a) is inconsistent with, and inapplicable to, dispositional orders of juvenile courts, and such orders are appealable pursuant to Rule 120.01 and § 211.261." *Id.* at 28.

While *C.A.D.* is not directly on-point to this case, we choose to follow its reasoning and apply it to the facts here. In the case at hand the dispositional phase had not yet been reached when the motion to intervene was denied. In addition, § 211.261 is not available to support an appeal, for reasons discussed above. Nonetheless, it is evident that the juvenile court's ruling on the

motion to intervene was a complete determination of the rights of the grandparents. That ruling forever barred them from taking part in the underlying termination case.[5] If we were to hold that the denial of the motion to intervene is not a final, appealable judgment at the time the ruling is made, then Grandparents are forced to wait to appeal until the entire underlying termination case is heard and decided. This delay casts a pall over the juvenile proceedings if this court determines Grandparents should have been allowed to intervene at the outset, making L.J.H.'s custody insecure. Such a procedure cannot be in the best interests of L.J.H., Grandparents, or the state. Accordingly, we hold that the denomination requirement of Rule 74.01(a) is inconsistent and inapplicable to the juvenile court's ruling denying Grandparents' motion to intervene brought pursuant to § 211.177. The juvenile court's ruling denying Grandparents' motion to intervene is a final, appealable order.

■ We now turn to the merits of the case. Grandparents voluntarily abandoned their first point on appeal at oral argument. Therefore, we only address their second point. That point is as follows:

THE COURT ERRED IN DENYING APPELLANT'S MOTION TO INTERVENE BECAUSE THE GREENE COUNTY JUVENILE OFFICER DID NOT REBUT THE PRESUMPTION THAT APPELLANT ESTABLISHED A RIGHT TO INTERVENE UNDER 211.177 RSMo IN THAT THE ONLY EVIDENCE ADMITTED AT THE HEARING, PHOTOGRAPHS PURPORTED TO SHOW INJURIES SUSTAINED BY THE MINOR CHILD AND TESTIMONY THAT THE MINOR CHILD HAD BEEN PREVIOUSLY INJURED, DID NOT SATISFY THE JUVENILE OFFICER'S BURDEN OF PROOF THAT IT WOULD NOT BE IN THE CHILD'S BEST INTERESTS TO SUSTAIN THE MOTION.

A review of the evidence requires that the juvenile court's ruling be affirmed.

■ The juvenile court's ruling denying the motion to intervene will be reversed only if there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Long v. Seely*, 975 S.W.2d 208, 210 (Mo.App. E.D.1998). The power to set aside the juvenile court's judgment should be exercised with caution and with a firm belief that the judgment is wrong. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We consider the facts in the light most favorable to the juvenile court's judgment. *In re the Interest of S.L.J. and E.M.J.*, 3 S.W.3d 902, 907 (Mo. App. S.D.1999).

■ By the express terms of § 211.177 the test for determining whether a grandparent's motion to intervene should be granted is not whether intervention would be in the best interests of the child, but rather whether it would be against the best interests of the child to allow the grandparents to intervene. § 211.177.1; *Long*, 975 S.W.2d at 211. Thus, there is a rebuttable presumption that grandparents should be allowed to intervene. *Id.* The Juvenile Officer had the burden to prove that the intervention of Grandparents would not be in the best interests of L.J.H.

5. It is recognized that the grandparents have other avenues for seeking custody of their grandchild other than the motion to intervene, such as adoption, for example. That does not negate our responsibility to analyze the finality of the judgment denying the motion to intervene.

*Id.* The Juvenile Officer presented evidence on this issue. Barbara Adams, a social worker from the Division of Family Services ("DFS") testified, the court took judicial notice of its court file, and an exhibit showing pictures of L.J.H.'s injuries was admitted into evidence. Although given an opportunity to do so, Grandparents did not testify.

The evidence showed that the discovery of the abuse of L.J.H. occurred when L.J.H.'s mother's live-in boyfriend, D.L., made a 911 call on the morning of January 20, 2001, saying that a four-year-old girl fell and was unconscious. While on the telephone with the 911 operator, D.L. said that the child was fine and tried to cancel the ambulance. Officers from the Springfield Police Department were dispatched to the residence to check on the well-being of the child. When the officers arrived, they saw D.L.'s son, who was walking around. D.L. told the officers that his son was the child that had been unconscious, but no signs of injury were apparent to the officers. After going to another room to examine where the boy allegedly fell, an officer saw L.J.H. sitting on a couch in the back living room.

The officers described L.J.H.'s appearance as follows:

> The girl's entire face appeared bruised with really bruised eyes. She was sitting up; but was staring straight ahead .... [L.J.H.] was holding her left arm with her right hand. She also had a swollen lower lip which was bloody. [L.J.H.] said her arm and stomach hurt .... [L.J.H.'s] face was badly bruised, both eyes blackened, her bottom lip had dried blood [dark in color] and was still bleeding and raw as if she had recently injured or re-injured it. She had two small lacerations on either side of her nose approximately an inch in length. The small scratches were red in color

but not bleeding. She was holding her left arm with her right hand. Her left arm was noticeably swollen compared to her right arm....

When an officer asked L.J.H. when she got hurt, she replied, "I just did." D.L. then explained that L.J.H. tried to pull his son off a shelf and he fell on her. D.L. then told the officers that he was not home when L.J.H. got hurt, and he was not sure when she got hurt.

L.J.H.'s mother ["Mother"] then arrived. Mother gave an explanation for L.J.H.'s injuries inconsistent with that of D.L.'s. Similarly, D.L. and Mother told different stories about when the injuries occurred, with Mother stating that the injuries occurred over a week ago. Neither admitted to physically abusing L.J.H. Mother had not sought any medical treatment for L.J.H because she knew the doctor would involve DFS and Mother did not like DFS and was afraid L.J.H. would be taken from her. L.J.H. and D.L.'s son were taken to the hospital, where L.J.H. was later admitted.

Upon being examined at the hospital, L.J.H.'s clothes were removed and her injuries were examined more closely. One of the responding officers viewed these injuries. He reported:

> I observed several bruises on the back of [L.J.H.'s] legs and buttocks. The bruises were not in any particular shape or pattern but were dark purple in color. The bruising on [L.J.H.'s] face and neck was also a dark purple. [An] RN .... pointed out two swollen areas on [L.J.H.'s] head. One was on her forehead and had a slight pale green and yellow tint to it indicating an older injury. The other was on the back of [L.J.H.'s] head [and] had encompassed most of the back part of her skull. The swelling caused a deformity to the shape of [L.J.H.'s] head. I could not observe

the color because of [L.J.H.'s] hair. I did notice that it appeared that [L.J.H.] had had some of her hair pulled out of her head. There were some small bald spots on the top of her head. There were also dark purple bruises behind both of her ears. Both of [L.J.H.'s] cheeks were red and blue in color. The marks on her cheeks seemed to worsen as time [passed]. [L.J.H.] had what appeared to be a bite mark on her right upper arm around the tricep area. There was another semi-circular laceration on her right forearm. There were numerous scratches and small cuts on her hands and arms. A large patterned abrasion was noticed on her right inner arm near her elbow. [The nurse] also pointed out what appeared to be bite marks on the tops and bottoms of both her big toes. Two small sores/blisters were located on [L.J.H.'s] pelvic region near her vagina. I was advised that her hymen was still intact and there did not appear to be any evidence of sexual assault. [L.J.H.] reportedly had a hairline fracture in her left arm near her elbow.

The officer took twenty-four pictures of L.J.H.'s injuries, which were admitted in to evidence at the hearing on Grandparents' motion to intervene.

More details of L.J.H.'s injuries were in evidence through a report written by the treating physician that was a part of L.J.H.'s hospital records contained in the court's file. The doctor stated that she had "what is considered raccoon eyes" which is the result of bleeding. The report also states in part:

> She also has a large handprint bruise on her left cheek which appears to be 3–5 days old. Her nose appears clear at this time, but she has symmetric scabbed cuts on either side of her nose, 1 cm .... She has an extremely swollen lower lip with crusting and bleeding.
>
> ....
>
> She has one faint, old bruise on her midline spine.
>
> ....
>
> On her right upper arm, she has a 4–5 day old bite mark measuring 4 cm across. She also has a newer abrasion to her inner right arm. There is a 4 cm bruise on her right outer elbow ....; that bruise appears to be approximately three days old. .... Her hands have multiple scratches, described by the child as bite marks. Her sacrum [6] has a 1.5 cm well-healed laceration.
>
> ... On her right thigh, she has a 3.5 × 2 cm bruise, which appears to be 4–5 days old. She has fingerprint bruises on her right outer thigh, multiple; they appear to also be 4–5 days old. On her posterior right thigh, she has 1–2 day old bruises, five, measuring 1–2 cm across. On her posterior left leg, she has two minor recent abrasions. No other bruising.
> BUTTOCKS: Have more faint bruises.
> FEET: On her bilateral great toes, she has symmetric scratches, described as bite marks by the child. The child states that her Daddy bites her toes. She has a faint, 2 cm old bruise on the top of her left foot, which appears to be more than 7–8 days old.

The doctor stated that the "multiple injuries" were "evident of repeated child abuse." L.J.H. also repeatedly complained that her stomach hurt. Her arm was put in a splint and a sling. She was placed into protective custody.

---

**6.** "Sacrum" is defined as "the triangular bone just below the lumbar vertebrae, formed usually by five fused vertebrae (sacral vertebrae) that are wedged dorsally between the two hip bones[.]" THE SLOANE-DORLAND ANNOTATED MEDICAL-LEGAL DICTIONARY 624 (1987).

The descriptions of L.J.H.'s injuries and the pictures of those injuries show abuse that occurred repeatedly over approximately one week. Barbara Adams, the DFS investigative worker who met L.J.H. at the hospital on January 20, 2001, testified that when she was talking to L.J.H. about things other than her injuries, L.J.H. "was very calm and very stoic." She inferred from L.J.H.'s "lack of emotion" that the abuse "was not something unusual for her." Adams testified that she thought "[t]he circumstance of being injured by someone ... was something that [L.J.H.] was used to." The evidence presented by the Juvenile Officer indicated that L.J.H. suffered repeat instances of significant abuse.

The police and hospital records that were part of the court file show an address for Mother, D.L., and L.J.H. that is the same address shown for Grandparents on the Notice of Appeal. Grandparents' attorney stated that L.J.H. "has, from time to time in the past, lived with" Grandparents. Grandparents' motion to intervene stated that Grandparents "have been a constant part of the minor child's life[.]" The guardian ad litem stated that she did not believe intervention would be in L.J.H.'s best interests, in part because the abuse occurred while Mother lived in Grandparents' house.

These facts are sufficient to show that Grandparents should have been aware that L.J.H. was being abused. The child's injuries were on parts of her body where they should have been apparent to any person seeing L.J.H., especially if that person had been a "constant part" of her life. It is reasonable to infer that such extreme abuse could not be ongoing without Grandparents' knowledge.

It is indefensible to be aware of such abuse and do nothing to help the child victim. It certainly is against the child's best interests. It is not necessary that the evidence presented by the Juvenile Officer be that Grandparents inflicted the abuse themselves to prevent them from intervening. The Juvenile Officer proved that Grandparents' failure to protect the child from abuse shows that their intervention in the termination suit is not in L.J.H.'s best interests. This is especially true when Grandparents were seeking to intervene in the termination case for the purpose of gaining custody of L.J.H., a goal admitted to by Grandparents in their brief and in oral argument.

The Juvenile Officer met his burden of proving that it would be against L.J.H.'s best interests to allow Grandparents to intervene. This was not a case like in *Long v. Seely, supra,* a case relied upon by Grandparents, where the appellate court reversed the denial of the grandmother's motion to intervene on the basis that the juvenile officer failed to present any evidence to establish the grandmother's intervention was against the best interests of the child. 975 S.W.2d at 212. The only objection to the intervention in *Long* was that DFS had a case plan in effect and wanted to terminate parental rights. *Id.* at 211–12. That objection did not prove the intervention was not in the child's best interests. *Id.* Nor is this case similar to the situation in *In the Interest of C.M.D.,* 18 S.W.3d 565 (Mo.App. W.D.2000), also relied upon by Grandparents. In *C.M.D.* the grandmother's motion to intervene was denied without an evidentiary hearing, resulting in a complete lack of evidence that the intervention was against the child's best interests. 18 S.W.3d at 569–70. The appellate court reversed the denial of the motion to intervene on that basis. *Id.* at 570.

In this case the Juvenile Officer sufficiently presented evidence showing that intervention would not be in L.J.H.'s best

interests. Grandparents then had the burden of rebutting the Juvenile Officer's evidence. If Grandparents were, in fact, not aware of the abuse, had not been living with the parties, or had not seen L.J.H.'s injuries, they should have presented that evidence. Grandparents did not make any objection when the juvenile court stated it would take judicial notice of its court file containing the police and hospital reports nor did they cross examine the Juvenile Officer's evidence. Without any evidence rebutting the Juvenile Officer's evidence, he proved it would be against L.J.H.'s best interests to allow Grandparents to intervene in the termination case. The juvenile court did not err in overruling the motion to intervene. The judgment is affirmed.

PREWITT, J., and PARRISH, J., concur.